# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

STARR LYNN KIOGIMA,

        Defendant-Appellant.

UNPUBLISHED
July 26, 2016

No. 326159
Eaton Circuit Court
LC No. 14-020114-FC

---

Before: TALBOT, C.J., and HOEKSTRA and SHAPIRO, JJ.

SHAPIRO, P.J. (*dissenting*)

I respectfully dissent. Because there is insufficient evidence of malice as defined in *People v Goecke*, 457 Mich 442; 579 NW2d 868 (1998), I would vacate defendant's second-degree murder conviction, MCL 750.317. I would, however, affirm her conviction of operating a motor vehicle under the influence (OUIL) causing death, MCL 257.625(4), and her sentence of 10 to 15 years imprisonment on that conviction.[1]

In addition, I write to respectfully suggest that the Michigan Supreme Court further clarify the legal standards to be applied in determining when a defendant may be charged with and convicted of second-degree murder arising out of a drunk-driving fatality. The Supreme Court first allowed such common-law prosecutions in *Goecke* in 1998. In my view, the common-law standards defined in *Goecke* are too imprecise to provide sufficient guidance to juries, and so challenge the principle of consistent application of a defined rule of law.

## I. BASIS FOR DEFENDANT'S CONVICTION

Defendant's actions led to her daughter's tragic and unnecessary death. Defendant's blood alcohol count was .21 shortly after the crash that occurred around 1:30 p.m. According to her statement to the police at the scene, defendant drank very heavily the previous night before going to bed at 4:00 a.m. and when she woke up at 8:00 a.m. she did not think she was still drunk. It appears the effects of the alcohol may have been mitigated by the fact that defendant,

---

[1] Given this result, I would not reach the additional questions presented in defendant's brief on appeal.

an alcoholic, had a high tolerance, but her blood alcohol content was nevertheless a particularly high level, more than twice the legal limit.

After waking, defendant stated that she got her older daughter off to school, prepared a lunch for her husband, and drove to his worksite to drop it off. Defendant's four-year-old daughter was in a booster seat in the backseat of defendant's vehicle. On the way home, defendant stopped for gas and bought her daughter some candy. She stated that she put her daughter back in the booster seat and buckled her in with the seat belt, but not the shoulder harness, and she presented expert testimony to that effect. The prosecution, however, presented testimony from an expert that the child was not buckled in at all.

There was conflicting evidence as to defendant's speed while she was driving on the entrance ramp. Several witnesses testified that she was driving under the posted limit, whereas an accident reconstructionist testified that she was traveling 76 to 79 miles per hour. On the ramp, defendant opened the candy and turned to hand it to her daughter who had been asking for it. Defendant took her eyes off the road at that moment. The vehicle traveled onto the grassy divider between the entrance ramp and the right lane of the highway and defendant lost control of it. In the resulting rollover crash, defendant's daughter was thrown from the vehicle and killed.

In order to convict defendant of second-degree murder, the prosecution had to prove that she acted with malice. In Michigan, malice sufficient to convict a defendant of second-degree murder is defined by common law, not by statute. Malice takes three forms: "the intent to kill, the intent to inflict great bodily harm, or the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result." *People v Dykhouse*, 418 Mich 488, 495; 345 NW2d 150 (1984). In this case, the prosecution did not allege that defendant specifically intended to kill or inflict great bodily harm, or any harm, on her daughter. Defendant was charged solely on the basis of the third form of malice, i.e., "the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result." Traditionally, this form of malice is the basis for depraved-heart murder.[2]

In *Goecke*, our Supreme Court held that "drunk driving alone is [not] sufficient to establish probable cause of malice." *Goecke*, 457 Mich at 469. Nevertheless, the Court held that second-degree murder may be charged where the drunk driver's other actions are such that, combined with the intoxication, a jury could find that the driver acted with "wanton and wilful disregard of the likelihood that the natural tendency" of the defendant's conduct was to cause death or great bodily harm. *Id*. at 464, 468-469.

---

[2] The precise terms used to define malice sufficient to convict a defendant of depraved-heart murder are varied and, as discussed below, would benefit greatly from clarification. However, regardless of which variation is used, I do not believe that sufficient evidence was presented to demonstrate that defendant acted with malice in this case.

In *Goecke* there were three cases consolidated for appeal: *People v Goecke*, *People v Hoskinson*, and *People v Baker*. An examination of the facts in each case is helpful.

In *Hoskinson*:

Defendant was staggering when he left the bar [after drinking for two hours]. Testimony indicated that defendant may have refused the offer of one of his friends to drive. Defendant twice drove his vehicle into a parked car while trying to leave the parking lot. He next drove through a residential neighborhood at speeds of approximately forty to sixty miles an hour. Speed dips were located at almost every intersection throughout this neighborhood. Defendant had driven down this street numerous times and was aware of the speed dips.

A vehicle traveling westbound just ahead of the defendant was stopped at a stop sign. Defendant swerved into the eastbound lane and passed the stopped vehicle, and then immediately swerved back into the westbound lane in order to avoid hitting an oncoming vehicle. Defendant hit a speed dip and lost control of his vehicle. He hit the westbound curb, swerved left, then swerved right, and struck a car parked on the right side of the street. Defendant jerked his wheel to the left, accelerated, drove across the eastbound lane, over the curb, and across some grass where he hit [a] four-year-old [child] who was riding her tricycle on the sidewalk. . . .

An officer who was called to the accident scene testified that defendant approached him and admitted that he was the driver. A blood alcohol test disclosed that defendant's blood alcohol level was 0.22 percent. In a statement to the police, defendant admitted that he knew he was drunk when he left the bar and that he was driving too fast. Testimony indicated that before the accident occurred the occupants of defendant's car told defendant to slow down. [*Goecke*, 457 Mich at 454-455.]

In *Goecke*, the defendant drank approximately seven to nine bottles of beer while sitting in his car in the parking lot of a liquor store. *Id*. at 448. When a police car drove into the lot, the defendant drove off in order to find a different place to drink and continued to drink while he drove around. *Id*. at 449. Later, while doing an estimated 70 to 80 miles per hour on a city road, the defendant nearly struck a van. *Id*. The van driver attempted to tell the defendant to slow down. *Id*. There was also testimony that the defendant thereafter drove through a red light without hitting anyone and that he then drove through a second red light, this time striking a vehicle and killing its driver. *Id*. at 449-450. "Approximately fifteen to twenty empty beer bottles were observed on the floor of the defendant's car." *Id*. at 450. At the scene of the accident the defendant stated: "I was going way too . . . fast. I have had to[o] . . . much to drink . . . . I should not have been driving. I know I'm drunk." *Id*. (first alteration added).

The defendant in *Baker*, like the defendants in *Goecke* and *Hoskinson*, was driving excessively fast—he was driving at twice the speed limit on a city road while intoxicated. *Id*. at 451. He approached an intersection where he had a red light. *Id*. at 451, 471. He saw multiple cars crossing the intersection directly in front of him as he sped towards it. *Id*. at 471. Nevertheless, without braking, the defendant continued into the intersection at about 70 miles per

hour. *Id*. at 452-453 n 7. The defendant narrowly avoided hitting two cars before striking a third and killing its driver and passenger. *Id*. at 451.

After examining the facts of each case, the *Goecke* Court concluded that the defendants' convictions were justified by behavior that rose to a level of culpability beyond that demonstrated only by driving while intoxicated. *Id*. at 469-473. The facts in those cases, however, are far afield from the facts in the instant case. In the *Goecke* cases, the defendants were operating their vehicles at high speed on local streets and repeatedly ignored traffic control devices at busy intersections. They failed to stop at crashes and/or near misses that occurred just minutes or seconds before the fatal crash, despite the fact that these events could not have left any doubt that continued driving represented a clear and present danger. Two of the *Goecke* defendants were warned by occupants of their vehicle or other vehicles that they were unfit to drive and their driving was out of control. In sum, the *Goecke* defendants did not merely ignore the general risk of driving while intoxicated. They also ignored the immediate and direct evidence that their driving on that particular journey had already nearly resulted in catastrophe and that the likelihood of serious injury or death was not merely a possibility but was extremely probable absent an immediate change.

In the instant case, however, the facts do not rise to that level of culpability. There was no evidence that defendant had a prior accident or near miss that morning. There was no evidence that anyone urged her to stop driving.[3] There was no evidence of her having driven recklessly until the incident on the entrance ramp. Nor was there any evidence that she had ever been ticketed or arrested for drunk driving prior to this incident. See *People v Werner*, 254 Mich App 528, 531, 534; 659 NW2d 688 (2002) (upholding a second-degree murder conviction when the facts showed that the defendant drove drunk despite knowledge that drinking heavily had caused him to black out in the recent past). Defendant's daughter's death was caused by four things: (1) defendant's consumption of alcohol and prescription drugs, (2) defendant's failure to properly seatbelt her daughter into her the booster seat,[4] (3) defendant's failure to keep her eyes on the road while on the highway entrance ramp, and (4) her speed on the entrance ramp of six to nine miles over the speed limit. Under such circumstances, defendant's actions were grossly

---

[3] To the contrary, a gas station clerk and a store owner who saw defendant that morning before the crash testified that they did not think she was drunk or should not be driving.

[4] The prosecution placed great emphasis on defendant's failure to properly seatbelt her daughter. While failing to do so had a catastrophic result and was negligent, I question whether it can be legally viewed as evidence of malice. By statute, failing to properly restrain a child in a vehicle is a civil infraction, not a crime. See MCL 257.710d (child less than four years old) and MCL 257.710e(5) (children between the ages of four and sixteen). The failure to do so "may be considered evidence of negligence." MCL 257.710e(7). However, the recovery of damages for such negligence shall not be reduced by more than 5%. MCL 257.710e(7). Moreover, the requirement that children be seat belted is still not universal. For instance, our law does not require children to be seat belted on school buses or taxicabs. MCL 257.710d(3); MCL 257.710e(1) and (2).

negligent, but did not rise to the level of malice necessary for depraved-heart murder. Accordingly, I would vacate her second-degree murder conviction.

## II. THE NEED FOR CLARIFICATION OF THE *GOECKE* STANDARD

Beyond the appeal we decide today, this case serves to point out the need for additional guidance from the Supreme Court. Since *Goecke* was decided in 1998, there has been a dearth of caselaw addressing the meaning of depraved-heart murder within the specific context of drunk-driving fatalities.

Depraved-heart murder has always been a nebulous concept. Until *Goecke*, however, its application appears to have been limited to factual scenarios that were so clear that the vagueness of the concept could be ignored. Classic examples of depraved-heart murder include firing a bullet into a room that the defendant knows is occupied by several people, starting a fire at the door of an occupied dwelling, or shooting into a moving vehicle. See 2 LaFave, Substantive Criminal Law (2d ed), § 14.4, p 440.[5] In such situations, the likelihood of death or injury is overwhelming; indeed, absent particularly good fortune someone is almost certain to be hurt or killed. Moreover, anyone taking the action would or should know this to be the case. An observer need not know whether someone was ultimately hurt to know that any person who commits such an act does so with a depraved heart, one which is at best indifferent to the death or infliction of injury on others. Indeed, few would dispute that where no injury results, a person who takes such action could properly be charged with attempted murder.

In other circumstances, distinguishing between gross-negligence manslaughter and depraved-heart murder is far more difficult. While we do not expect every jury to think identically, the rule of law depends on our ability to trust that the law is sufficiently clear so that two juries that reach identical factual findings will reach the same verdict absent nullification. Jurors are to judge facts, not law. The problem was well-articulated by the Mississippi Court of Appeals in *Johnson v State*, 52 So3d 384, 399-400 (2009):

> It is apparent that even the trained legal professionals . . . grappl[e] with determining a clear distinction between a depraved-heart murder of a specific

---

[5] 2 LaFave, Substantive Criminal Law (2d ed), § 14.4, pp 440-441 provides:

> The following types of conduct have been held, under the circumstances, to involve the very high degree of unjustifiable homicidal danger which will do for depraved-heart murder: firing a bullet into a room occupied, as the defendant knows, by several people; starting a fire at the front door of an occupied dwelling; shooting into the caboose of a passing train or into a moving automobile, necessarily occupied by human beings; throwing a beer glass at one who is carrying a lighted oil lamp; playing a game of "Russian roulette" with another person; shooting at a point near, but not aiming directly at, another person; driving a car at very high speeds along a main street; shaking an infant so long and so vigorously that it cannot breathe; selling "pure" (i.e., undiluted) heroin.

individual and the lesser offense of manslaughter. . . . Presiding Justice Hawkins was prophetic when he stated that "[w]hether [a] defendant is convicted of murder or manslaughter will depend upon the whim or circumstance of the jury hearing the case, *not upon understandable instructions delineating what constitutes each crime.*" [quoting *Windham v State,* 602 So 2d 798, 805 (1992) (emphasis added).][6]

The problem of defining the difference between gross-negligence manslaughter and depraved-heart murder is at its most confounding in the context of drunk-driving fatalities. The personal misery and social costs of drunk driving is beyond debate, and deterrence through the application of the criminal law is necessary. However, in our evidence-based system, we must not ignore that the likelihood that any single drunk driving incident will result in injury or death is of a fundamentally different order than that present in activities such as setting fire to an occupied dwelling or shooting into a crowded room.[7] This comparison is not intended to minimize the terrible cost these crashes incur nor to suggest that Michigan should not vigorously seek to eliminate drunk-driving incidents altogether. However, it helps to demonstrate the complexity of the problem of determining (non-retrospectively) whether the driver was negligent, grossly negligent, or acted with a depraved heart.[8]

The lack of clarity regarding this form of common-law murder is demonstrated by the inability of the courts and commentators to settle on the definition of the required intent.

---

[6] See also 2 LaFave, Substantive Criminal Law, § 14.4, pp 437-438 ("The distinction between an unreasonable risk and a high degree of risk and a very high degree of risk are, of course, matters of degree, and there is not exact boundary line between each category; they shade gradually like a spectrum from one group to another. Some have thus questioned whether this is a sound basis upon which to make the important distinction between murder and manslaughter.").

[7] It appears that alcohol-related injury crashes and alcohol-related fatal crashes in Michigan occur at the rate of about 1 in 500 and 1 in 25,000 respectively. According to the Center for Disease Control and Prevention, Michigan has approximately 497 alcohol-impaired driving incidents annually per 1,000 members of the population. See http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6430a2.htm, last accessed July 18, 2016. This means that, with a population of just under 10 million, Michigan has nearly 5 million alcohol-impaired driving incidents per year, out of which, thankfully, only a very small percentage result in crashes causing injury and a far smaller percentage result in crashes causing death. According to Michigan Traffic Crash Facts (MTCF), in 2015 the total number of alcohol-related crashes was 9,537 and the total number of alcohol-related fatal crashes was 271. See http://publications.michigantrafficcrashfacts.org/2015/At_a_Glance_2015.pdf, last accessed July 11, 2015.

[8] It may be that the difficulty in determining intent was a reason that the Legislature adopted MCL 257.625(4), which defines a standard penalty for all drunk-driving caused deaths regardless of intent. The statute provides for a 15 year term unless the driver's blood alcohol level is greater than .17%, in which case the term is 20 years. *Id.*

According to Black's Law Dictionary (5th ed), a depraved mind exhibits: "ill will, hatred, spite or evil intent." Our caselaw offers several other variations. In *People v Aaron*, 409 Mich 672, 728; 299 NW2d 304 (1980), the Supreme Court stated:

> malice is the intention to kill, the intention to do great bodily harm, or the wanton and willful disregard of the likelihood that the natural tendency of defendant's behavior is to cause death or great bodily harm.

In *Dykhouse*, 418 Mich at 495, the Court defined depraved-heart murder as requiring "the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result." Next, the jury instruction on second-degree murder provides that the third-method of establishing malice, i.e. depraved-heart malice, exists if the defendant:

> knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of [her] actions. [M Crim JI 16.5.]

Further, in *Goecke*, our Supreme Court quoted the language from *Aaron* requiring "wanton and willful conduct." *Goecke*, 457 Mich at 464. However, the Court also expressly approved the definition of malice from *People v Fuller*, 86 Cal App 3d 618, 628; 150 Cal Rptr 515 (1978), which provided that "malice may be implied when the defendant does an act with a *high probability* that it will result in death and does it with a base antisocial motive and with wanton disregard for human life." *Goecke*, 457 Mich at 467 (emphasis added). The *Goecke* Court further noted the language in *Fuller* was meant to supplement, not supplant the requirement that the conduct be done with a wanton and willful disregard for the act's natural tendency to cause death or great bodily harm. *Id*. at 467 n 31.

That these standards are inconsistent demonstrates both the nebulous nature of the charge and the need for clarification from our high court.[9] They also demonstrate that our common law seems to leave the distinction between gross-negligence manslaughter and depraved-heart murder to the whims, emotions, and idiosyncrasies of a given jury rather than to a clear rule of law. It is basic to our system of justice that we ask juries to determine facts, but that the law defines the crime to which those facts attach. When it comes to depraved-heart murder, at least in the context of drunk driving, two juries could be presented with the exact same set of uncontested facts and could rationally reach different verdicts, one finding manslaughter and one finding depraved-heart murder, not because they see the facts differently, but because they see the legal nature of the crime differently. The legal distinction between gross negligence and the

---

[9] I would respectfully suggest that the jury be instructed that the defendant's actions must pose a "near certainty" of serious injury or death and that the jury be specifically instructed that they are to determine defendant's intent strictly as of the time he took his actions, i.e. before the actual harm occurred. If the actual harm is considered it is difficult to see how a jury could ever find no intent, even if the pre-harm risk was modest.

present depraved-heart standards is so porous as to effectively allow each jury to create its own set of instructions. [10]

## III. CONCLUSION

In this case, I would conclude that insufficient proofs of depraved-heart murder were submitted. Accordingly, I would vacate defendant's murder conviction while affirming her OUIL causing death conviction for which she was sentenced to a term of 10 to 15 years in prison.

/s/ Douglas B. Shapiro

---

[10] I am not suggesting that defendant's *subjective* awareness of the danger posed her behavior is relevant. Since voluntary intoxication is not a defense to murder, *Goecke*, 457 Mich at 464, if someone shoots a gun into a crowded room in a drunken state it is not a defense to murder, at least in Michigan, that he was too drunk to properly consider the risks. The question therefore, at least where a defendant claims that voluntary intoxication clouded his ability to comprehend the risk, is whether the actions, if taken by someone who did understand the risks would demonstrate an unambiguous willingness to cause death or great bodily harm.